# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) **ROLAND HUFF,** ) | |
| *Individually and on Behalf of All* ) | |
| *Others Similarly Situated***,** ) | |
| ) | |
| **vs.** ) | **Case No. 22-CV-044 GKF-JFJ** |
| ) | |
| (2) **BP CORPORATION NORTH** ) | |
| **AMERICA, INC., and/or** ) | |
| **METROPOLITAN LIFE INSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant(s).** ) | |

## FIRST AMENDED COMPLAINT
### (BASED ON ERISA)

Plaintiff Roland Huff, pursuant to his rights under ERISA and three contracts he is a party to, respectfully comes before this Court seeking relief against Defendant BP and/or Metropolitan Life Insurance Company (hereafter "MetLife").[1] [2]

## Introduction

Plaintiff first and foremost seeks answers to questions and documentation regarding huge increases in rates and premiums for a life insurance policy contract he has <u>with MetLife</u>. When obtained, the information and documentation will be handed over for review and analysis by an expert life insurance actuary to determine whether the increases were justified, reasonable and fair

---

[1] MetLife is named as a Defendant now based on a good faith belief it will become clear during discovery that it is appropriate to do so.  However, a summons has not been issued and will not be issued to MetLife unless and until sufficient information showing MetLife's responsibility for wrongdoing against Plaintiff is discovered as this action proceeds against BP. If sufficient information is not discovered Plaintiff will voluntarily dismiss MetLife.

[2] DISCLOSURE: Plaintiff's counsel has never been involved, not in almost 30 years of practicing law, in an ERISA governed lawsuit. If he swerves across the lines while journeying on this ERISA highway it will be unintentional, and he apologizes in advance to Defense Counsel and the Court.

per the terms of the policy, industry standards, and ERISA. Exhibit 1 is a list of the increases Plaintiff has suffered over the last 9 years without explanation or reasons given for the increases. His current monthly cost is $2,236.08 for his insurance coverage under Policy No. 32900-G, which MetLife and BP say is an "employee retirement benefit" subject to ERISA.  Plaintiff doubts that is true but pursuant to two Court Orders he now proceeds under ERISA, and he is grateful the Court is allowing him to do so.

## Summary of Plaintiff's Objectives

Plaintiff's objectives are simple:

To obtain from BP and/or MetLife answers to questions, information, and documentation they have been withholding from Plaintiff for over two years regarding huge increases in his insurance rates and premiums. The withholding of this information and lack of cooperation is also known as and referred to herein as stonewalling. Stonewalling is a violation of ERISA as well as a breach of the parties' contracts.

Additionally, to obtain from BP and/or MetLife a refund and other financial recompence for overcharging Plaintiff for his life insurance coverage since at least 2015, and perhaps before then. For the first time and upon newly discovered evidence, Plaintiff claims in this amended complaint that BP (and/or MetLife) have not been honest (or simply not competent) in calculating his premiums per express representations in their published insurance rate charts. Therefore, they have overcharged him for his insurance coverage. Overcharging him is a violation of his ERISA rights as well as a breach of the parties' contracts.

Additionally, to obtain answers to questions and documentation from BP and/or MetLife showing, definitively, whether Policy No. 32900-G is truly part of BP's employee retirement plan and presently under BP's Benefits Center's <u>active</u> control, management, and administration.  In

pleadings, MetLife and BP have alleged the policy is actively controlled and managed by BP but no employees have verified that and only 1 piece of paper has been produced in support of it. If BP and MetLife have not told truth, they have violated ERISA and breached of the parties' contracts.

Additionally, depending on the outcome of a review of the information and documentation sought, Plaintiff might then have evidence enough to add the following allegations and to obtain remedies for these potential claims of wrongdoing:

(a) BP and/or MetLife have been using fraudulent, unjustified, price gouging, and unjust self-enriching insurance rate increases and, therefore, have also increased Plaintiff Huff's life insurance premiums fraudulently since he first purchased the policy; and/or

(b) BP and/or MetLife have misrepresented to the Court and Plaintiff that the subject life insurance policy (Policy No. 32900-G) is an "employee retirement benefit" subject to ERISA rather than a personal life insurance policy contract between Plaintiff and MetLife only.

However, these two allegations and claims must wait to be made another day, if ever at all. Plaintiff Huff would respectfully show the Court the following:

<u>**Jurisdiction and Venue**</u>

1.      Plaintiff Huff and his wife, his beneficiary, have lived in Tulsa County, Oklahoma since 1981. Furthermore, he entered the subject life insurance policy contract with MetLife in October 1998, when and while he was working for Amoco Corporation in Tulsa County, Oklahoma. *See* Exhibit 2.

2.      At that time, Amoco was in the process of being bought out by BP, and when Plaintiff Huff retired on or about December 31, 1998, the company was referred to as BP Amoco.[3] However, the subject life insurance policy he obtained at BP Amoco, Policy No. 32900-G, lives on and provides $264,000.00 of life insurance coverage to Plaintiff Huff and his beneficiary who still live in Tulsa County, Oklahoma. *See* Exhibit 3.

3.      The claims alleged herein arose out of the BP's (and/or MetLife's) actions and inactions regarding the subject policy while Plaintiff was/is living in Tulsa County, Oklahoma and paying for the policy coverage directly from his bank account in Tulsa County.

4.      Although BP's headquarters are in Houston, Texas, BP, per this link: https://www.bp.com/en_us/united-states/home/where-we-operate.html, owns and operates or uses a "Pipeline Control Center" in northeastern Oklahoma and a "Biogas" facility in western Oklahoma.

5.      The Retiree Benefits "Service Contract(s)" Plaintiff made and still has with BP were made while he was living in Tulsa County, Oklahoma and while BP was operating the two facilities mentioned above in Oklahoma, and one of them located in Northeastern Oklahoma.

6.      BP, through its Benefits Center, is the Plan Sponsor and Administrator of a small ($22,000[4]) MetLife life insurance policy for Plaintiff Huff (and others similarly situated) - Policy No. 12000-G. *See* Exhibit 4.  This life insurance policy is provided by BP at no cost to Plaintiff as a genuine and irrefutable "retirement benefit."

---

[3] Huff retired at age 56 because during the buy-out process BP "offered" him and all others age 55 and over "early retirement."

[4] $22,000.00 currently, but in previous years was up to $88,000 coverage.

7.      BP also provides, manages, and controls retiree Health and Dental insurance benefits to Huff through its Benefits Center. The BP Benefits Center withdraws automatic premium payments from Huff's Bank of Oklahoma account in Tulsa every month in the amount of $194.48 for those benefits. BP has done so for many years.

8.      Additionally, BP is allegedly (Plaintiff repeats: BP is "allegedly") the active plan sponsor and active administrator in control of the subject MetLife life insurance policy, Policy No. 32900-G, for Plaintiff Huff (and others similarly situated) while he lives in Tulsa County and pays MetLife directly with checks written from his bank located in Tulsa County.[5]

9.      Since BP is, allegedly, the active plan sponsor and administrator of the subject policy, the policy and Plaintiff's dispute with BP and MetLife are allegedly subject to ERISA. And being subject to ERISA, this Federal Court has exclusive jurisdiction over the subject policy, Plaintiff's dispute with BP and MetLife, and all the issues raised and to be raised in this lawsuit.

10.     Accordingly, Plaintiff Huff believes this Federal Court has jurisdiction over this action and venue is proper in Tulsa, Oklahoma.

### History & Background Information

11.     All foregoing paragraphs are incorporated herein by reference.

12.     The life insurance policy that is the subject of this lawsuit is identified as follows:

Group Life Insurance Policy No.:     32900-G
Group No.:                           95520
Certificate No.                      95520-98867645711
Policyholder:                        Trustee of the MetLife Group Insurance
                                     Trust

*See* Exhibit 3.

---

[5] "Allegedly" because it has been so alleged by BP and MetLife and believed by the Courts but is NOT yet believed to be true by Plaintiff and his counsel. Why? See paragraph 105. Notwithstanding the reasons stated in paragraph 105, it is hoped that the information and documentation sought in this lawsuit will reveal the truth about that (hopefully) so that this issue can be settled and done with.

13.    Plaintiff is billed directly by MetLife for the subject policy, and he pays the premiums for the policy directly to MetLife by check. All questions and correspondence about the subject policy have <u>always</u> been directly between MetLife and Plaintiff only. This has been the *Course of Dealings* and the *Course of Performance* of the subject insurance policy by the parties for over 20 years.

14.    For over 20 years, as far as Plaintiff Huff knew, BP was not involved in the management and administration of Policy No. 32900-G. Plaintiff states again for emphasis, the *Course of Performance* and the *Course of Dealings* of the subject policy have always been between Plaintiff and MetLife <u>only</u> for over 20 years.[6]

15.    Last year, on or about July 14, 2021, Plaintiff filed suit against MetLife due to MetLife's failure/refusal to respond, for nearly TWO years, to Plaintiff's letters and requests for information and documentation about the increases in his premiums for the subject policy.

16.    To be more exact, Plaintiff started asking MetLife for information and documentation about the increases in his premiums in January 2020. MetLife NEVER responded. Thus, a lawsuit was filed - Case No. 21-CV-00284-CVE-CDL – to try to get it.

17.    In that lawsuit, in a Motion to Dismiss, <u>MetLife officially and unequivocally pointed the finger at BP</u>, saying BP was <u>solely responsible</u> for the subject policy and the rate and premium increases.

---

[6] *May v. Paul Revere Life Ins. Co.*, Case No. 5:13-CV-28 in the USDC ND/West Virginia (2013), states when there is no longer any connection of the employer to <u>a life insurance policy</u> and when the employer no longer controls and handles the administration of the life insurance policy, **the relation back to an ERISA plan is lost and breaks the justification for ERISA preemption**. Plaintiff's counsel expects the evidence discovered in this action will show BP does not actively control, manage and handle the administration of Mr. Huff's Policy No. 32900-G and probably NEVER has. MetLife does! But we'll see about that.

18.    MetLife made these exact statements to the Court in its motion (these are quotes from MetLife's pleading):

> *MetLife does not control and is not responsible for setting or changing the cost of benefits under the Plan, or for disclosures related thereto.*
>
> *That is the responsibility of BP as the Plan Sponsor and/or Plan Administrator.*
>
> *And if* [Mr. Huff] *wants information about these costs and changes, he can request such from BP.*
> *BP intended to establish and maintain the Plan for the purpose of providing benefits to participants and their beneficiaries, in accordance with ERISA.*
>
> *The SPD* [BP's (employee/retiree) Life and Accident Plan Handbook] *outlines participants' rights under ERISA, including the right to request and obtain from BP all documents governing the Plan, and invites participants to direct "any questions about" the Plan to BP.*

19.    The Court granted MetLife's motion and that case was dismissed on October 25, 2021.

20.    As Plaintiff's counsel understood MetLife's motion and the Court's Order, the primary reason for the dismissal was MetLife's official representation to the Court that MetLife does not manage or administrate the subject policy, and, therefore, had nothing to do with the increased rates and premiums.

21.    As quoted in paragraph 18 above, MetLife told the Court that:

(a) BP was the subject policy's sponsor and administrator.

(b) BP was responsible for the increases in Plaintiff's premiums.

(c) The subject policy is subject to ERISA since BP is in control of and manages it for its employee-retirees.

(d) Plaintiff has the right, under ERISA, to request the information from BP.

(e)  If [Mr. Huff] wants information about these costs and changes, he can request such from BP.[7]

22.     Depending on what is discovered during this lawsuit against BP, MetLife might be served with summons and brought into this lawsuit. If so, Fraud, Breach of Contract, and Bad Faith will likely be alleged in addition to violating ERISA for withholding answers to questions and documentation Plaintiff's expert actuary needs.  Again, such potential allegations depend on what is discovered for the first time in this lawsuit but was sought after and denied to Plaintiff in *Huff v. MetLife* and for 19 months before then.

23.     In reliance upon MetLife's representations and "advice" in its motion to dismiss, Plaintiff's counsel contacted BP, and then presented to the Court (in Plaintiff's response to MetLife's motion to dismiss) what he understood BP had said. Which was a full denial of MetLife's above quoted statements regarding the subject policy. And included a statement that Plaintiff had converted the policy to a personal life insurance policy at or near the time of his retirement.[8]

24.     Plaintiff's presentation of BP's position to the Court was admittedly weak and lacking because no one at BP would go on record about it. The person he spoke to, Tonya, would not/could not even provide her last name. Thus, the Court did not *"buy it"* and dismissed the case based upon MetLife's more believable statements, exhibits and arguments. So be it.

---

[7] Funny thing is, Plaintiff followed MetLife's "advice" and asked BP for that information, but BP would not give it up either.

[8] Plaintiff's counsel cannot quote what was said but is merely stating his understanding of comments made to him on the phone. However, it should be noted **BP recorded all those conversations** or at least said they were being recorded. Thus, those recordings, if truly made, WILL reveal the exacts statements BP personnel made to Plaintiff's counsel.

25.    Since the Court believed and accepted MetLife's statements and dismissed Plaintiff's lawsuit, Plaintiff had no other reasonable choice but to contact BP again. This time he hoped to get BP's official position about the subject policy stated in writing, on BP's letterhead, and signed by someone with authority to do so.

26.    Or, in the alternative, if BP truly was in control of and managed Plaintiff's policy and premium increases as accused by MetLife, Plaintiff asked BP to answer some questions and provide the documentation he had asked MetLife for.

27.    Plaintiff asked BP for the information beginning August 18, 2021, up until December 12, 2021. BP failed and refused to answer Plaintiff's questions and provide the requested documentation.[9]  Therefore, this lawsuit was filed.[10]

28.    And by now, by the filing date of this First Amended Complaint, Plaintiff has obviously asked BP again for specific information and documentation regarding the increases in his rates and life insurance premiums.  And, obviously, BP still refuses to do so and will not do so unless and until this Court orders BP to do it.

### A Variety of Allegations
(& Some Arguing Too)

29.    All foregoing paragraphs are incorporated herein by reference.

### Stonewalling

30.    By now Plaintiff has more questions, but the questions Plaintiff asked BP to answer before filing this lawsuit are set forth in Exhibit 5, which is a letter Plaintiff's counsel sent to BP.

---

[9] Plaintiff's counsel was baffled by BP's refusal to be helpful since METLIFE had represented to the Court in *Huff v. MetLife* that Plaintiff had the right to ask BP, that BP had the information, and that BP would provide the information. It is going to be interesting finding out, WHY NOT?

[10] Plaintiff feels frustrated and dismayed about BP forcing him to file this lawsuit to obtain the information he has requested. This lawsuit is a burden on Plaintiff's counsel. With a little help and cooperation by BP (and/or MetLife) this lawsuit could have been avoided.

BP never answered that letter, nor the 3 additional letters Plaintiff's counsel sent to BP in search of information and documentation.

31.     Plaintiff Huff will turn 80 years old this year.  He is a stroke victim and sickly, and BP knows that. Like MetLife, BP has shown no concern for Plaintiff's health and well-being. And by refusing to answer Plaintiff's questions BP has added more stress and worry to Plaintiff's already weakened condition.  BP has ignored the obvious: the average BP retiree cannot afford to pay $2,236.08 a month for life insurance without feeling much stress and anxiety, and eventually the retiree will have to stop making the payments if the increases continue.

32.     And by now, Plaintiff has begun to believe, and therefore tentatively alleges, that is what BP and/or MetLife want to happen. They want Plaintiff to lapse his policy for lack of ability to pay the premiums. Why? So, they do not have to pay out life insurance Benefits to Plaintiff's beneficiary.[11]

33.     Plaintiff, through his counsel, submitted questions to BP Benefits Center in writing, asking for a letter in return answering those questions, on August 18, 2021, November 1, 2021, November 9, 2021, and December 7, 2021.  To date, BP has failed and refused to answer Plaintiff's questions in writing.

34.     Plaintiff's counsel also called BP (at 800.890.4100) at least 10 times on the following dates: August 17, August 24, November 2, November 9, November 16, November 23, December 1, December 2, December 3, and December 6, all in 2021.

---

[11] What a scam this might turn out to be. Let's see here – **Step 1**: Collect premiums from BP retirees as long as you can. **Step 2**: Raise the rates from time to time to an eventual unaffordable amount. **Step 3**: Force retirees to lapse their policies. **Step 4**: Retirees forfeit/lose their life insurance BENEFITS. **Step 5**: No pay out of insurance BENEFITS to retiree beneficiaries. **Step 6**: KEEP all the premiums that have been collected & Make FREE Money - 100% Profits!! *Such a Deal*. If so, or even close to it – What a Huge Scam BP and/or MetLife have going.

35.     On the phone various BP Benefits' Center employees (Tonya, Nelson, Shelby, Chris, Chevon & a supervisor named, Valkie) were somewhat helpful, but they did not and <u>would not</u> answer the questions asked in Plaintiff's counsel's letters, even though one or the other of them verified the letters had been received and were in BP's computer files regarding Plaintiff Huff. And even since this lawsuit was filed in December 2021, BP has continued its refusal to answer Plaintiff's questions.[12]

36.     While on the phone, however, per Plaintiff's counsel's understanding and interpretation, more than one of the above-named BP Benefits Center employees, at the least, <u>indicated</u> **MetLife is completely in error** about the subject life insurance policy being managed and administrated by BP.[13] Frustratingly, BP personnel never officially said that in writing, and eventually stopped communicating with Plaintiff's counsel altogether.

37.     Thus, Plaintiff alleges, BP and MetLife are guilty of stonewalling him. And stonewalling is a Violation of ERISA, a Violation of his Contracts with them, and a Violation of Common Human Decency. And, furthermore, such behavior is <u>appalling</u> <u>and</u> <u>inexcusable</u>.

<u>Contracts, Adhesion Contracts, and Breach Thereof</u>

38.     Regardless of ERISA, Plaintiff's relationship with BP and MetLife are contractual relationships. Furthermore, although BILLION $$ corporations, BP and MetLife, in this lawsuit, are nothing more than *just another party to a contract* involved in a contract dispute. Even under

---

[12] Seems to Plaintiff – *Something Is Truly Amiss* with all the STONEWALLING going on around here.

[13] Again, Plaintiff's counsel cannot quote what was said but is merely stating his understanding of comments made to him on the phone. However, it should be noted BP recorded all those conversations or at least said they were being recorded. Thus, those recordings, if truly made, WILL reveal the exacts statements BP personnel made to Plaintiff's counsel.

ERISA that's all they are. They are nothing special and should receive no special regard from the Court.

39.     Moreover, a contract is a contract is a contract; and it remains a contract that must be performed according to its terms regardless of ERISA and, actually, because of ERISA when the contract provides life insurance as <u>Employee</u> <u>Retirement</u> <u>Benefits</u>.

40.     Per exhibits filed by both BP and MetLife in their motions to dismiss, BP's *Life and Accident Plan* includes or otherwise incorporates BP's *GUL insurance program*, which *they say* and claim also includes MetLife's life insurance contract with Plaintiff, Policy No. 32900-G. *See* Exhibit 6 filed herewith, which is a few pages copied from MetLife's exhibit <u>attempting</u> to establish Policy No 32900-G is part of BP's *Life and Accident Plan*. [14] [15]

41.     Regardless of ERISA, BP's retiree benefit plan, the *BP Corporation North America Inc. Life and Accident Plan,* is a contract.

42.     Regardless of ERISA, BP's retiree life insurance program plan called, *BP's Group Universal Life (GUL) Insurance Program* is a contract.

43.     Regardless of ERISA, Plaintiff's MetLife life insurance policy, Policy No. 32900-G, is a contract for life insurance. And it is between Plaintiff Huff and MetLife ONLY. Upon Plaintiff's death his beneficiary will call and deal with MetLife only, regarding Policy No. 32900-G, not BP. On the contrary, regarding Policy No.12000-G (Exhibit 4 hereto) the policy BP actively controls and manages, Plaintiff's beneficiary must call and deal with BP, not MetLife.  *See* Exhibit 12, at par. 13.

---

[14] *See* Document 13-1 filed in Case 4:21-cv-00284 and/or BP's Exhibit 1 – Plan Document. Both are the same 48 Pages. Copies of MetLife's exhibit is used in Plaintiff's Exhibit 6 because the court clerk's legend or "stamp" at the top of BP's Exhibit 1 is illegible.

[15] See also Paragraph 105 below where Plaintiff points out major defects in Defendants' proposal that page 48 of 48 establishes Plaintiff's 32900-G insurance policy is part of BP's *Life and Accident Plan*.

44.     Regardless of ERISA, all three contracts, are <u>Adhesion</u> <u>Contracts</u>. As such, the terms of these contracts were not negotiated by the parties nor were they even negotiable to begin with. All three were forced upon Plaintiff Huff on a "take it or leave it" basis, and at that time and even still today, he was/is in no position to up and "leave it." Therefore, he simply acquiesced and continues to acquiesce today recognizing BP and MetLife, presently, have ALL THE POWER in his contractual relationship with them.[16]

45.     Regardless of ERISA, there are laws and rules that govern Adhesion Contracts and Courts must adhere to and apply them in disputes over life insurance contract terms and retirement benefits.

46.     Regardless of ERISA, one of those rules is, neither party can change a term or avoid an obligation, commitment, or responsibility under the contract just because they want to or feel like it, or just because they think they can because of who they are.

47.     Regardless of ERISA, there is a rule of interpreting Adhesion Contracts that requires Courts to construe terms against the party who wrote and propagated the contract in favor of the one who didn't (a/k/a *the little guy*).

48.     In this case, the three contracts listed above were written and propagated by BP and/or MetLife. Therefore, if any term in the contracts becomes an issue in this lawsuit, they must be construed in a light most favorable to Plaintiff Huff (*the little guy*) and against BP and/or MetLife.

---

[16] They say, jump and he jumps s*o to speak*. They say, PAY HUGE increased premiums for your life insurance policy and he pays it. Every month. As the saying goes, *They Got Him by the ...... Scruff of the Neck*.  And there's been nothing he could do about it. Until now, hopefully. It is Plaintiff's hope that this honorable Court intervenes and puts BP and MetLife "in their place" -- as *just another one of the parties to a contract in a contract dispute*. **For they are truly nothing more than that**.

Raising Rates Unilaterally =
<u>Changing Contract Terms Unilaterally</u>

49.     Regardless of ERISA, per the terms of the 32900-G life insurance contract and because of ERISA, the insurance rates <u>originally</u> agreed upon (the <u>original</u> insurance rate chart) and the resulting premiums CANNOT be raised randomly and anytime MetLife and/or BP feel like it. Neither BP nor MetLife have the right nor the authority to simply raise rates and premiums any time they deem it convenient for themselves.  Why? Because it is a CONTRACT.

50.     Regardless of ERISA, it is not honest nor fair for BP and/or MetLife to raise Plaintiff's insurance rates and premiums without consideration of and without explanation to Plaintiff (and others similarly situated). Doing so amounts to and is the same as **unilaterally** <u>changing the insurance contract terms</u> the parties originally agreed to.  Said another way, they can't change the rates agreed upon by the parties any time they want to because changing rates and premiums is changing contract terms. They Can't Do That Unilaterally! Nobody can just go around changing contract terms anytime they feel like it. Nobody.

51.     Being unfair to Plaintiff and others similarly situated, and in violation of ERISA and specific contract terms, that is in fact what BP and/or MetLife did in 2013, and perhaps at other times <u>before then</u>. In 2013, MetLife simply mailed a notice to Plaintiff changing his rates and premiums. *See* Exhibit 7. In this notice, they simply "announced" rates were being raised and basically just *shoved the rate increases down Plaintiff's throat* on a like it or lump it, take it or leave it, and End of Discussion basis.  They Can't Do That! Not under ERISA. Not under the rules and laws governing Adhesion Contracts. No, They Can't! Nobody can.

Loss of Benefits =
Being Denied Benefits

52.     If Plaintiff decided to *leave it* today, and he might be FORCED to *leave it* soon, he would lose his $264,000 in life insurance coverage AND over $135,000.  $135,000 is the approximate amount of money he has paid to date for his life insurance "retirement benefits" coverage under MetLife Policy No. 32900-G. That is, "retirement benefits," **if** MetLife and BP are telling the truth calling the policy that, which Plaintiff doubts but we'll see.

53.     The subject 2013 increases in rates and premiums, and perhaps other increases before then, are essentially and effectively whittling away at and decreasing Plaintiff's opportunity to maintain and receive his life insurance coverage "Retirement Benefits." And ultimately, the increases may/will eventually --

        (a)     force him to lapse his policy and forfeit all the money he has already paid for his life insurance "Retirement Benefits," and

        (b)     force him to forfeit his "Benefits" under the policy, and

        (c)     force him to forfeit the "Benefits" of his Beneficiaries as well.[17]

54.     Forcing the forfeiture of retirement benefits, as it appears BP and/or MetLife are doing here, is the same thing as Denying someone their retirement benefits.

55.     Regardless of ERISA, certain and absolute conditions must be satisfied, and certain industry standards must be followed before rates and premiums for life insurance can be raised. Why? Because it's a life insurance CONTRACT.

---

[17] As alleged in par. 32 above, this is apparently what BP and/or MetLife want to happen. Why would these Billion $$ Corporations want that? So, they can make FREE MONEY, 100% Profits. That's why. Do that to thousands of people every year and you make lots of Free Money. Lots!

56.    And because the subject insurance policy contract, allegedly, involves Employee Retirement Benefits, ERISA requires BP and/or MetLife to do what is <u>in the best interest of BP's retirees</u>, as well as <u>in the best interest of their beneficiaries</u>. *See* Exhibit 8, page 3(d) and/or paragraphs 75-78 below.

57.    And there is *no way and no how* that raising life insurance premiums over 1000% in 9 years is in the best interest of any of BP's retirees and their beneficiaries.  No Way!

<u>Obligation to Answer Questions</u>

58.    Upon information and belief, under the contracts and ERISA, BP and/or MetLife were required to provide Plaintiff, in a timely manner, answers to his questions, and other information and documentation he requested about his life insurance policy, Policy No. 32900-G. To date, both BP and MetLife have failed and refused to do so.

59.    Upon information and belief, under the contracts and ERISA, BP and MetLife had an obligation and duty to deal with Plaintiff in good faith, with the utmost fairness and care, which is a/k/a - doing what is <u>in his best interest</u>. To date, both BP and MetLife have failed and refused to do so.

60.    Upon information and belief, under the contracts and ERISA, BP had an obligation and the duty to answer the questions Plaintiff's counsel submitted to BP <u>in Plaintiff's behalf</u> regarding the subject life insurance policy and the representations MetLife made to the Court in *Huff v. MetLife*, Case No. 21-CV-00284-CVE-CDL. To date, BP has failed to do so.

61.    Upon information and belief, under the contracts and ERISA, BP had an obligation and duty to GO ON RECORD and either confirm or deny MetLife's representations about the subject life insurance policy to the Court in *Huff v. MetLife*.  Bp failed to do so up to the date it filed its motion to dismiss herein.

62.    Before this lawsuit was filed on December 14, 2021, BP refused to fulfill the above-mentioned obligations. In fact, it willingly, knowingly, and intentionally refused to do so. Thus, BP breached its contract(s) with Plaintiff <u>and</u> violated ERISA.

<u>BP's Admission of Being Responsible</u>

63.    BP's Motion to Dismiss (filed herein on 01/31/2022, Document 9) "sounds like" to Plaintiff that BP finally fulfilled its obligation to Go on Record and either confirm or deny MetLife's representations to the Court in *Huff v. MetLife*. And it appears and "sounds like," BP, has in fact admitted to all of MetLife's allegations and accusations.

64.    Therefore, per BP's admissions (and MetLife's accusations) Plaintiff <u>alleges</u> the following (even though Plaintiff doubts the truthfulness/accuracy of the admissions).

65.    Allegedly, BP is the Plan Sponsor of the subject life insurance policy, Policy No. 32900-G.

66.    Allegedly, BP is the Plan Administrator of life insurance policy, Policy No. 32900-G.

67.    Allegedly, BP is solely responsible for deciding, calculating and establishing the <u>rates of insurance</u> used to calculate Plaintiff's premiums for Policy No. 32900-G.

68.    Allegedly, BP is solely responsible for deciding, calculating and establishing Plaintiff's rates and premiums for Policy No. 32900-G.

69.    Although it is a fact that all billing statements for premiums are mailed directly to Plaintiff by MetLife, and Plaintiff pays his premiums by checks mailed directly to MetLife, BP allegedly is solely responsible for and dictates the amount of Plaintiff's premiums that MetLife bills him for and has billed him for over the last 20 years or so.

70.     Although it is a fact that all billing statements for premiums are mailed directly to Plaintiff by MetLife, and Plaintiff pays his premiums by checks mailed directly to MetLife, BP allegedly is solely responsible for the increase in Plaintiff's life insurance rates and the 1000% + increase in Plaintiff's life insurance premiums over the last 9 years or so.

71.     Allegedly, BP is solely responsible for raising Plaintiff's rates and premiums (and those of other's similarly situated) without providing any explanation and supporting documentation showing the increases were justified, reasonable and fair, and all in accordance with policy terms and industry standards.  BP has provided no explanation at all.

72.     Concerning the rate increases, BP, allegedly, took the approach that Plaintiff (and all others similarly situated) can like it or lump it, take it or leave it. Apparently, BP decided – BP is the boss of the MetLife life insurance policy No. 32900-G, and they can do whatever they want, whenever they want to do it; and they don't have to explain anything to BP retirees. Besides that, BP (and/or MetLife) hope retirees let their policies lapse anyway, so BP (and/or MetLife) doesn't have to pay out money to their beneficiaries when they die.

73.     Allegedly, BP is solely responsible for all calculations made and for gathering all information taken into consideration for its decision to raise rates and premiums for Policy 32900-G.

74.     Allegedly, BP is responsible for maintaining and storing all documentation of those calculations and information used by BP and/or MetLife in the decision to raise rates and premiums on Policy 32900-G.  Therefore, BP has all that information and documentation readily available to hand over to Plaintiff's expert actuary for review and analysis.

<u>Plaintiff's ERISA Rights</u>

75.     As noted above, BP's contracts with Plaintiff, the *Life and Accident Plan* and the *GUL Insurance Program*, were filed as exhibits in both MetLife's motion to dismiss and BP's motion to dismiss. *See* MetLife's Document 13-1 filed in Case 4:21-cv-00284-CVE-CDL and BP's Exhibit 1.

76.     They are the same document – the BP *Life and Accident Plan* that *they say* includes and incorporates BP's *GUL Insurance Program*, and which *they say* also includes Plaintiff's MetLife Policy No. 32900-G (altogether hereafter referred to as, "*The Plan*").

77.     Per *The Plan*, Plaintiff Huff has rights under ERISA.  A copy of a page, from *The Plan,* spelling out some of those ERISA rights is filed herewith as Exhibit 8. Page 3 of Exhibit 8 is titled – "Your ERISA Rights."  Based upon the – "Your ERISA Rights" page - Plaintiff claims the following Rights under ERISA:

(a)     Plaintiff Huff (and others similarly situated) are *entitled to certain rights and protections* under ERISA.

(b)     Plaintiff Huff (and others similarly situated) have the right *to examine all documents governing the plan, including insurance contracts* … Plaintiff alleges further, although not spelled out, this includes all information and documentation regarding decisions to change the contract terms, *The Plan's* terms, by RAISING RATES AND PREMIUMS for his life insurance coverage under Policy No. 32900-G.

(i)     Being more specific, Plaintiff has a right to examine all documentation showing and proving whether the huge raises in the rates and premiums of his life insurance policy were and is justified, reasonable and fair.

19

(ii)     That is, Plaintiff has the right to examine all the information and documentation that shows whether BP and/or MetLife took into consideration, applied and followed commonly accepted industry standards, and all the factors, edicts and promises in his life insurance contract, Policy No. 32900-G, at page 18, par. 9 titled - *Changes in Policy Cost Factors* - BEFORE they raised his rates and premiums <u>every time since the date</u> he purchased his policy. *See* Exhibit 9, which is page 18, par. 9 of the subject policy.

(c)     Plaintiff Huff (and others similarly situated) have the right *to obtain copies of governing plan documents* … Plaintiff alleges further, although not spelled out, this includes all information and documentation regarding decisions to change the contract terms, *The Plan's* terms, by RAISING RATES AND PREMIUMS for his life insurance coverage under Policy No. 32900-G.

Paragraphs (i) and (ii) above are incorporated here by reference.

(d)     Plaintiff Huff (and others similarly situated) are OWED DUTIES by and from *the people who are responsible for the operation* of BP's *Life and Accident Plan* contract ("*The Plan*"), which, *they say*, includes his life insurance contract with MetLife, Policy No. 32900-G.

The people who operate The Plan are called *"fiduciaries" and have a DUTY to operate The Plan* and manage his life insurance policy contract with MetLife *PRUDENTLY and with <u>HIS BEST INTERESTS</u> in mind* (NOT MetLife's or BP's best interests in mind, Plaintiff's).

(e)     He has the assurance and promise that *NO ONE* (such as, BP or MetLife) *may discriminate against him* (such as, discrimination because of his age) *to prevent him*

*from obtaining benefits under The Plan* (such as, raising his insurance rates and premiums so HIGH <u>because of his age</u> that he can no longer pay the premiums and therefore ultimately will be DENIED his life insurance Benefits due to his policy lapsing).

(f)     He has the right to make a *claim for a benefit that is denied and ignored* (such as his life insurance coverage Benefits that are in the process of being forfeited, denied, and ignored) due to his inability to continue paying the HUGE premiums. Therefore, he has the *RIGHT to KNOW WHY this was done* and *to obtain copies of the documents relating to the decision* to raise his rates and premiums 1000%.

(g)     He has the right to file this lawsuit for the purpose of getting his questions answered and to obtain the documents and information he has requested from MetLife and BP because *he requested materials from The Plan* about *The Plan and did not receive them within 30 days*. And, furthermore, Plaintiff has the right *to be paid $110.00 a day* for everyday BP and/or MetLife has failed and refused to produce the requested materials.

(h)     *If successful* in this litigation he has the right to have his *court costs and legal fees* paid by BP and/or MetLife.

78.     Said another way for emphasis, pursuant to the – Your ERISA Rights page - BP and MetLife at all times pertinent had **actual notice** that they were required to provide Plaintiff the information and materials he requested within 30 days and, if they did not, that Plaintiff had the right to file a lawsuit against BP and/or MetLife in order to obtain the information and materials he requested (AND to be paid $110.00 per day every day BP or MetLife fail to comply with his requests).

<u>Fraudulent Billing</u>

79.     This lawsuit was originally filed primarily because, as alleged above, BP was stonewalling Plaintiff (as did MetLife) by not answering his questions and requests for documentation his expert life insurance actuary needs to review.

80.     Unbelievably, BP continues the stonewalling, thus breaching the parties' contract terms and violating his rights under ERISA, even up to this date while all the while crying out - *this is an ERISA matter*. [18]

81.     But, by now, as of the date of filing this amended complaint, <u>this</u> lawsuit is about more than just the stonewalling and trying to get documentation to find out whether the rate and premium increases are justified or fraudulent, and whether the subject policy is truly subject to ERISA as an "employee retirement benefit." It is <u>also about</u> Plaintiff (and others similarly situated) being Fraudulently/Erroneously Billed by BP through MetLife's billing system.

82.     In BP's Motion to Dismiss (Document 9 at pages 9 & 26), BP acknowledges and admits a notice was sent to Plaintiff <u>by MetLife</u> but saying <u>BP had announced</u> his rates would increase over the next TWO years, and a new rate chart - *Monthly Cost of Insurance Rate Chart* - was included in the notice. The noticed referenced by BP is Exhibit 7 filed herein.

83.     Per its recent admissions and confession, BP initiated and is solely responsible for that notice and chart (allegedly). Thus, apparently, BP is responsible for the resulting increases in

---

[18] Seems to Plaintiff, it is disturbing and outrageous that MetLife and BP have all along been crying out that Plaintiff's complaints are subject to ERISA, yet they have not fulfilled any of their obligations to Plaintiff **per Plaintiff's rights under ERISA**.  If they had done so without requiring Plaintiff to file suit it is possible Plaintiff never would have filed suit. This lawsuit against BP and the one against MetLife were both filed because of STONEWALLING, which is clearly a violation of Plaintiff's RIGHTS under ERISA. Seems to Plaintiff, BP and MetLife should be, if possible, sanctioned for such bad behavior. The stonewalling was totally uncalled for and should be, seems to Plaintiff, deemed wholly unacceptable.

Plaintiffs rates of insurance, the increases in his premiums over the years, and the amounts he was billed for by MetLife (in BP's behalf, allegedly).

84.     Furthermore, the notice and chart constitute an express contract between BP and Plaintiff.[19] The notice and chart also constitute an express promise and representation that Plaintiff would not be charged higher monthly premiums than calculations per the new rate chart amounted to.

85.     Plaintiff admits he received the subject 2013 notice and does not at this time dispute that BP caused it to be sent to him by MetLife. However, it is a defective and insufficient notice in that it fails to explain the reason for and justification of the increases, which Plaintiff has a right to know under ERISA and the parties' contract terms.

86.     Having no other choice and having no say so in the matter, Plaintiff accepted the terms of the notice and simply went along with his rates being raised and his premiums being increased. That is, he simply paid the bills for his premiums MetLife mailed him every quarter, all the while trusting MetLife (and BP, apparently) that the premiums charged were just, correct, honest, fair, and in accordance with the 2013 *Monthly Cost of Insurance Rate Chart*.

87.     No other notice like the 2013 notice has been received by Plaintiff.

88.     It never crossed Plaintiff's mind that the premiums charged and the amount of the bills he received from MetLife (but dictated by BP, apparently) might be fraudulent, dishonest, unfair, and/or simply incorrect.

89.     And, furthermore, Plaintiff had no duty or obligation to *Redo the Math* and try to calculate or recalculate his life insurance premiums to figure out whether the premiums he was charged might be fraudulent, dishonest, unfair, and/or incorrect.

---

[19] And perhaps includes MetLife but per BP's admissions/confessions/statements in its Motion to Dismiss that connection is not being alleged. Not yet.

90.     The 2013 notice does not explain the reason and justification for the new rate chart and increases in monthly premiums. And although in 2020 Plaintiff began asking for an explanation and supporting documentation justifying the increases from both MetLife and BP, no explanation has ever been provided.

91.     The notice says the increases will occur over the next <u>TWO</u> years. However, it is now 9 years later, and the increases have not yet stopped.  Although allegedly responsible for the increases, BP has never explained why. Not even when asked.

92.     Shockingly, Plaintiff recently discovered the premiums he is charged EVERY MONTH by MetLife exceed the <u>promises and representations</u> of what he would be charged per the new 2013 rate chart.

93.     To be clear, the new chart – the promise and representation of what the new rates would be beginning in 2014 – is <u>not being followed</u>. MetLife, apparently <u>authorized</u> and <u>instructed</u> by BP to do so, charges Plaintiff (and others similarly situated) MORE THAN WHAT THE 2013 CHART SAYS WILL BE CHARGED.

94.     For example, <u>per the new rate chart</u>, today, at age 79, Plaintiff's premiums should only be **$1,727.35**.

6.543 rate per chart   X   264,000 coverage = 1,727,352

1,727,352 / 1,000 = **$1,727.35** <u>monthly</u> premium.

**Per The Rate Chart,**
**That's What the Monthly Premium Charged Should Be Today**

95.     However, that's not the amount Plaintiff is being charged.  The premiums MetLife is charging him (apparently, per BP's instructions and approval) are **$2,236.08** per month. That is **$508.73 more** <u>per month</u> than what BP and MetLife announced, promised, and represented he would be charged in 2013.  Again, the notice and rate chart are set forth in Exhibit 7.

96.     And the overcharges, erroneous charges, fraudulent charges have been going on **since 2015**.  *See* Exhibit 10 showing what Plaintiff should have been charged compared to what he has been charged.  Billing statements showing the billing amounts Plaintiff was charged on a <u>quarterly</u> basis are attached as Exhibit 11.  The amounts charged should be divided by 3 to get the "Actually Charged" <u>monthly</u> amount.[20]

97.     Thus, based on the foregoing, Plaintiff alleges a breach of his ERSA rights and of express contract terms by BP, fraudulent representations by BP, and Fraudulent Price Gouging and Unjust Enriching increases and overcharges in premiums by BP (and/or by MetLife) <u>through MetLife's billing system</u>.[21]

98.     There is NOTHING in ERISA or any other Federal or State law that permits, authorizes, allows, licenses, approves, condones, tolerates, enables, facilitates, okays, or forgives such despicable and dishonest behavior of an alleged Employee Retirement Plan Sponsor and Administrator such as BP (and/or an insurance company such as MetLife).

99.     Based on the foregoing, it is obvious that *the people* involved in the leadership and operation of BP's retirement benefits plan – the BP *Life and Accident Plan* (which includes and incorporates BP's *GUL Insurance Program* which "allegedly" includes Plaintiff Huff's MetLife Life Insurance Policy No. 32900-G) have breached their **fiduciary** relationship with Plaintiff Huff (and others similarly situated) and breached their **fiduciary duties** to operate *The*

---

[20] Note also, Exhibit 10 shows what Plaintiff would be charged today if the 2009 Rate Chart had not been changed and replaced by the 2013 Rate Chart - **$842.56 LESS**. As already stated, No Explanation has ever been provided as to WHY the 2009 Rate Chart was replaced with HIGHER rates. BP and/or MetLife just unilaterally did it.  It will be interesting to also find out during Discovery the reason(s) why the Rate Chart being used in 2008 and before was replaced with the 2009 Rate Chart. And to find out about the Rate Charts) before that as well. The 2009 Rate Chart is filed herein as Exhibit 13 just fyi.

[21] Attached hereto as Appendix A is notice of Plaintiff's intent to turn this lawsuit into a class action lawsuit if information and documentation discovered supports it.

*Plan* prudently and in the best interest of BP's retirees such as Plaintiff Huff and all others similarly situated. Shame on them!!

100.    Therefore, it seems to Plaintiff, BP (and/or MetLife) should be punished with a huge punitive damages amount hung around its neck, like unto the huge rate and premium increases they so willingly and inconsiderately hung around Plaintiff's neck (and that of others similarly situated).[22]

Summary of Wrongs Alleged Against BP

101.    BP, as the alleged, Plan Sponsor and Administrator of Policy No. 32900-G (and/or MetLife) has violated 29 U.S. Code§1132(c) by stonewalling Plaintiff. That is, they have failed and refused to provide the information and documentation materials Plaintiff has been asking for since January 2020, regarding the HUGE increases in his life insurance rates and premiums. In sum, Plaintiff wants to examine and obtain copies of all the information and documentation materials that show whether BP (and/or MetLife) took into consideration, applied and followed common industry standards and all the applicable factors, edicts, terms and implied promises in his life insurance contract  (Policy No. 32900-G, at page 18, par. 9 titled - *Changes in Policy Cost Factors*) BEFORE they raised his rates and premiums every time since the date he purchased his policy. Plaintiff seeks to find out through such documentation whether the HUGE increases he has and is suffering under (and which are forcing him into lapsing his policy) are justified, reasonable and fair. He has a right under ERISA and general contract law to know the answer to this question with certainty.

---

[22] Plaintiff recognizes ERISA probably does not provide the Court an opportunity to consider punitive damages. Although that probably means it cannot be done, seems to Plaintiff that does not mean it should not be done. Seems to Plaintiff, BP (and/or MetLife) deserve it. Therefore, it should be done! Even if it cannot be. Seems to Plaintiff, anyway.

102.     BP, as the alleged, Plan Sponsor and Administrator of Policy No. 32900-G (and/or MetLife) has violated ERISA and breached the terms of *The Plan*, which *they say* includes Plaintiff's life insurance policy No. 32900-G, in that Plaintiff (and possibly others similarly situated) has been overcharged for his insurance coverage since at least 2015.  And perhaps even longer than that.

103.     *The people* involved in the leadership and operation of BP's retirement benefits plan – *The Plan* (which allegedly includes Plaintiff Huff's MetLife Policy No. 32900-G) have breached their **fiduciary duties** to operate *The Plan* <u>prudently</u> and <u>in the best interest of BP's</u> <u>retirees</u> such as Plaintiff Huff, and all others similarly situated.

104.     Plaintiff has reason to believe the following:

(1) BP, as the alleged, Sponsor and Administrator of *The Plan* (and/or MetLife) has violated *The Plan*, ERISA, and other Federal and State Laws by raising his life insurance rates and insurance premiums without justification. And without adhering to, applying, and following commonly accepted industry standards and all the applicable factors, edicts, terms, and implied promises set forth in his life insurance contract (Policy No. 32900-G, at page 18, par. 9 titled - *Changes in Policy Cost Factors*)*; and*

(2) BP and MetLife might have misrepresented (mistakenly or otherwise) to the Court and Plaintiff that the subject life insurance policy (Policy No. 32900-G) is an "employee retirement benefit" presently and actively controlled and managed by BP and, therefore, subject to ERISA rather than a personal life insurance policy contract between Plaintiff and MetLife only.

However, more information and documentation are needed before the above two allegations of wrongdoing will be made. Plaintiff reserves the right to make these allegations later.

But For the Record
<u>Just in Case Defendants Want to Know</u>

105.     Here are some reasons why Plaintiff presently believes the subject MetLife life insurance policy, Policy No. 32900-G, is not an Employee Retirement Benefit under the active control and management of BP's Benefits Center.

(1) More than one of BP's Benefits Center employees told Plaintiff's counsel the subject policy is not actively controlled and managed by BP as an employee retirement benefit for Plaintiff Huff.

(2) The *Course of Dealings* and *Course of Performance* of the subject MetLife insurance policy establishes it is not actively controlled and managed by BP as a retirement benefit for Plaintiff Huff.

(3) MetLife and BP's exhibit page 48 of 48 (from Document 13-1 filed in Case 4:21-cv-00284 and/or BP's Exhibit 1 filed herein) indicates Plaintiff's policy is <u>not</u> THAT POLICY, is not the one referenced in their exhibits on page 48 of 48. Why?

When <u>that</u> certificate of insurance (filed herein as Exhibit 6) is compared to the certificates of insurance <u>Plaintiff has in his possession</u> (filed herein as Exhibits 2 & 3) major discrepancies are easily noted.

(a) The Date of Issue noted on their document is 1985, not 1998 like it is on Plaintiff's.

(b) Neither BP nor Amoco are noted on their document as the employer like they are on Plaintiff's.

(c) Group No. 95520 is not noted on their document like it is on Plaintiff's.

(d) The Policyholder named on their document is not the same as the Policyholder named on Plaintiff's.

28

AND … The Biggest Reason of All …

(4) **Exhibit 12** filed herein is evidence recognized and discovered within the last 2 weeks. It shows Plaintiff's policy is not actively controlled and managed by BP. In fact, the exhibits attached to Exhibit 12 show the subject policy is NOT listed as part of Plaintiff's benefits BP provides him as a retiree and Never Has Been. Plaintiff will point out the two most important points made in Exhibit 12.

- BP's Benefits Center employee recently told Plaintiff's wife, his beneficiary, the subject policy, Policy No. 32900-G, is not controlled and managed by BP as an employee retirement benefit for Plaintiff Huff. In fact, the employee said they know nothing about Policy No. 32900-G and it is not in the BP Benefits Center computer files regarding Plaintiff Huff.

- The Exhibits included with Exhibit 12, Exhibits A, B, & C, provide a list of the retirement benefits BP's Benefits Center has managed and assisted Plaintiff Huff with since the year 2000. Neither list mentions Policy No. 32900-G.

All that is why Plaintiff believes the "representations" by both Defendants about the subject policy are "misrepresentations."[23] But since Discovery hasn't even started no doubt there is more to be found out and considered.  Therefore, Plaintiff will wait for another day to officially make that allegation.

<u>Respondeat Superior</u>

106.    BP and MetLife are business entities that can only act through its officers,

---

[23] Seems to Plaintiff, **someone has a lot of explaining to do about all that**.

employees, and other individual agents. Any act or omission of BP's officers, employees or other agents is an act or omission of BP and/or MetLife.

107.    Therefore, if any employee, officer, or other agent of BP and/or MetLife are found to have harmed Huff in any way as alleged herein, BP and/or MetLife are liable to Huff (and others similarly situated) for their injuries and damages.

**REQUESTED RELIEF**

108.    Pursuant to 29 U.S.C. §1132(c), 29 U.S.C. §1132(a)(1)(B), 29 U.S.C. §1132(a)(3)(A) &(B) and *The Plan* at the "Your ERISA Rights" page (Exhibit 8 at pg. 3), Plaintiff seeks the following relief:

(a)    A Court Order enforcing his rights under *The Plan* and ERISA to examine and obtain copies of all the materials that show the information and documentation that BP (and/or MetLife) took into consideration, applied, and followed in raising his rates and insurance premiums every time since the date he purchased his policy in 1998.  29 U.S.C. §1132(c), 29 U.S.C. §1132(a)(1)(B), & Exhibit 8 at pg. 3 - Your ERISA Rights (a) - (g).

(b)    A Court Order enforcing his rights under *The Plan* and ERISA to get questions answered about *The Plan* as to whether BP truly is still connected to and still actively controls, manages and handles the sponsorship and administration of the subject life insurance policy. Said another way, to enforce his rights to find out and know with certainty whether the subject policy was converted to a personal life insurance policy like he thinks it was back when he retired, or whether the subject policy is still actively

sponsored, managed, controlled and administered by BP as an Employee Retirement Benefit.[24]  29 U.S.C. §1132(c), 29 U.S.C. §1132(a)(1)(B),

(c)     A Court Order enforcing Plaintiff's rights to obtain at least a REFUND for the total amount of money he (and others similarly situated) have been overcharged as premiums for his life insurance coverage since 2015, and perhaps even before that.  29 U.S.C. §1132(a)(3)(A) & (B), & Exhibit 8 at pg. 3 - Your ERISA Rights (d).

(d)     A Court Order enjoining BP (and/or MetLife) to do all of the above (a) – (c), and enjoining them to NOW STOP overcharging Plaintiff (and others similarly situated) for their life insurance coverage under the subject insurance contract, Policy No. 32900-G. Or, in other words, until further notice of the Court, enjoin BP (and/or MetLife) to only bill Plaintiff in accordance with the 2013 *Monthly Cost of Insurance Rate Chart*, which is included in Exhibit 7. Being more specific, for the time being, Plaintiff asks the Court to Order BP (and/or MetLife) to use **the 6.543 rate** per the insurance rate chart and bill him only **$1,727.35** per month for his coverage. 29 U.S.C. §1132(a)(3)(A) & (B), & Exhibit 8 at pg. 3 - Your ERISA Rights (d).

(e)     A Court Order enjoining BP (and/or MetLife) to pay:

(i)     Plaintiff and others similarly situated a Refund for overcharges since 2015;

(ii)    $110 day for every day *the materials* he requested beginning January 2020 has been withheld from him until the day they are produced; and

(iii)   Plaintiff's costs and attorney's fees.

---

[24] To date no evidence has been produced in support of the statements made by MetLife and BP in their pleadings that BP is such.  No evidence, just talk is all there has been.  Plaintiff has a right to find out and know for certain whether there is any evidence supporting what *They Say* about that.

29 U.S.C. §1132(c), 29 U.S.C. §1132(a)(1)(B), 29 U.S.C. §1132(a)(3)(A) &(B), & Exhibit 8 at pg. 3 - Your ERISA Rights (g) & (h).

(f)     Finally, Plaintiff requests, all "*Other Appropriate Equitable Relief*" the Court in its knowledge, experience and wisdom determines is available to Plaintiff under the presently known facts and circumstances of this case, and the information and facts to be discovered. 29 U.S.C. §1132(a)(3)(B), & 29 U.S.C. §1132(c).

## PRAYER

**WHEREFORE**, Plaintiff Huff respectfully requests, for himself and all others similarly situated, an Order from the Court in accordance with the above listed requests for relief.  May God Bless the Court with wisdom and guidance in Judging this difficult and confusing matter.

JURY TRIAL REQUEST RESERVED.
ATTORNEY'S LIEN CLAIMED.

Respectfully submitted,

_s/Jeffrey Martin_____

Jeffrey Martin, OBA#15573
Jeff Martin & Associates, P.C.
P.O. Box 18425
Oklahoma City, Oklahoma 73154
918.583.4165 Tulsa Office Phone
918.671.0841 Cell Phone
405.285.4624 Fax
jm8069337@aol.com

## Certificate of Service

I, Jeff Martin, do hereby certify that on the __16th__ day of __March__, 2022. I faxed, delivered, emailed or mailed a true and correct copy of the foregoing instrument (**First Amended Complaint**) with postage fully prepaid thereon, to:

Alison M. Howard, OBA #19835
CROWE & DUNLEVY,
324 North Robinson, Suite 100
Oklahoma City, Oklahoma 73102
alison.howard@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT**

_____s/Jeffrey Martin_____
Jeff Martin, OBA#15573

## APPENDIX A

Notice of Class Action Intentions

## CLASS DESCRIPTION & ALLEGATIONS

Plaintiff Huff incorporates all preceding allegations and information as if fully set forth herein.

**Please Note:**  Plaintiffs do not intend to ask the Court to certify a class action unless and until (a) any dispositive motion filed by Defendant is ruled upon in Plaintiffs' favor, and (b) information and evidence supporting a class action is obtained through discovery. This section is intended to simply give notice to the Court and Defendant of Plaintiff's intentions and to reserve the right to amend this Petition later and/or to file a motion to certify the class. Thus, the class description and allegations will be provided at a later date if and when appropriate. **Furthermore, should the evidence discovered support a class action, this case will hopefully be handed off to a law firm big enough to handle it and already experienced in class action lawsuits. Hopefully.**

## ANTICIPATED PHASES OF
## THE LITIGATION OF THIS MATTER

Plaintiff Huff incorporates all preceding allegations and information as if fully set forth herein.

**Please Note:** Huff anticipates two phases of this action - one starting now and a possible second phase starting after phase one.

**Phase one** is primarily to obtain the documentation needed by an expert actuary to determine whether the rate and premium increases discussed above are justified, reasonable and supportable per standards commonly accepted and followed in determining rate increases, (such as all the factors listed in Exhibit 9, par. 9). But also, and additionally, to prosecute the claim that BP and/or MetLife have overcharged and overbilled Plaintiff and others since at least 2015.

**Phase two** - the prosecution of Huff's claim, individually and in behalf of the class, against BP and/or MetLife for unjustified and unsupportable

premium increases will begin only if Plaintiff's expert actuary finds, through review and analysis of the documents obtained during phase one, that the premium increases over the last 8 years or so were unjustified and unsupportable under standards commonly accepted and followed in determining rate increase. For example, but not limited to, the factors listed in Exhibit 9, par. 9.